IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **DONOVAN COBLE and KAYLA COBLE** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 3:24-cv-00721**<br>**Judge Aleta A. Trauger** |
| **TPS PARKING MANAGEMENT, LLC, d/b/a THE PARKING SPOT** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

A detective with the Metropolitan Nashville Police Department, Donovan Coble and his fellow police officers responded to an emergency request from a parking service company to apprehend a suspect trying to hijack a vehicle on the company's property. Detective Coble was gravely wounded when trying to arrest the suspect. He now brings a claim for negligence against the parking service company, alleging that the company owed a duty to protect him from the criminal acts of the third party suspect on its property. This novel theory of premises liability finds no support under Tennessee law.

The defendant has filed a Motion for Summary Judgment (Doc. No. 26), arguing that the negligence claim fails as a matter of law because Detective Coble cannot establish that the defendant owed a duty to protect him from the criminal acts of an unknown third party. The court agrees, concluding that the defendant did not owe a duty to Detective Coble under the facts of this case. For that reason, the pending motion will be granted and the Complaint (Doc. No. 1-1) will

be dismissed in its entirety. In light of this ruling, the pending Motion *In Limine* to Exclude Plaintiffs' Expert (Doc. No. 46) filed by the defendant will be denied as moot.

## I. BACKGROUND

### A. The Parking Spot's Nashville Property and Operations

The Parking Spot ("TPS") is an Illinois-headquartered company that provides off-site, near airport parking services at various locations nationwide. (Doc. No. 2 at 4; Doc. No. 27 at 4.) The company has operated a location in Nashville, Tennessee ("TPS Nashville") since 2011 near Nashville International Airport. (Doc. Nos. 1-1 ¶ 5; 28-1 at 5:22–23.) TPS Nashville is a valet-only parking service, meaning that customers drive their vehicles into a covered bay area at the front of the property and provide their keys to an employee. (Response to Statement of Undisputed Material Facts ¶¶ 1, 6, Doc. No. 39.) The employee then parks the vehicle in one of the company's rear nine parking lots. (*Id*.) Customers board a shuttle operated by the company to the airport. (*Id*. ¶ 2.)

The areas accessible to customers at TPS Nashville are ordinarily limited to the covered bay areas (where customers pick up and drop off their vehicles and board shuttles) and the nearby front office building (where customers check in). (*Id*. ¶¶ 3–4; Doc. No. 28-1 at 6:13–17.) Customers do not ordinarily enter the rear parking lots where the cars are parked. (Doc. No. 39 ¶ 3.)

### B. TPS Nashville's Security Infrastructure and Policies

TPS Nashville claims to utilize a range of security measures designed to safeguard employees, customers, and vehicles parked on its lots. The parking lots are partially surrounded by fencing of various heights. (*Id*. ¶ 10.) Razor wire sits atop some segments of the chain-link fencing. (*Id*. ¶¶ 10–11; Doc. No. 28-2 ¶ 10.) The fencing bears signage stating that the parking lots are private property and that trespassing is prohibited. (Doc. No. 39 ¶ 11.) Although the parking

lots remain open during the day to allow valet personnel to park and retrieve customers' vehicles, the lot entrances are gated and locked at night. (*Id.* ¶ 12.) TPS Nashville does not monitor the parking lots with security cameras. (*Id.* ¶ 13.) The record is not clear on whether the company maintains a regular security presence in the rear lots.

TPS Nashville also claims to have policies and procedures to secure the property and customer vehicles. If an employee spots a trespasser on the property, the employee instructs the trespasser to leave the property and warns that police will be called if the trespasser refuses to leave. (*Id.* ¶ 21.) The company maintains a written policy that requires that customer vehicles remain locked while parked on the lots. (*Id.* ¶¶ 15–17.) The keys to customer vehicles are kept inside the front office building. (*Id.* ¶ 17.)

The company's policy regarding weapons left inside a customer's vehicle is less clear, to the extent one exists at all. TPS Nashville does not inventory the contents of its customers' vehicles. (*Id.* ¶ 18.) The company also does not ask customers to disclose whether weapons are stored inside the vehicle or advise customers before arriving at its location that weapons should not be left inside the vehicle. (Doc. No. 28-1 at 34:22–25—35:1–2.) TPS Nashville asserts that "employees will ask the customer to secure the firearm in a separately locked, non-visible area, or refuse service to the customer, instructing them to park elsewhere." (Doc. No. 39 ¶ 18.) However, Christopher Hockert—the general manager of the TPS Nashville since 2017 (Doc. No. 28-2 ¶¶ 2–3)—testified during his deposition as the company's corporate representative that no "specific policy" exists at the company regarding procedures for handling visible weapons. (Doc. No. 28-1 at 34:12.) Instead, Hockert follows "a personal policy" on the matter: if a weapon is "in plain sight" in the vehicle's interior, the customer must "secure it in the car, lock it in the glove box, lock it in

the truck, or they just need to go some place [sic] else." (*Id.* at 34:9–21.) The extent to which Hockert's "personal policy" has been adopted by TPS Nashville remains unknown.

### C. Prior Incidents of Crime at TPS Nashville

TPS Nashville has encountered its share of criminal activity, including multiple recorded instances of firearms being stolen from customer vehicles parked on the company's lots. (Doc. No. 39 ¶¶ 23, 25, 27–28.) Between July 2019 and August 2022, the Metropolitan Nashville Police Department received at least eight separate reports of firearms being stolen from customer vehicles parked at TPS Nashville. (*Id.* ¶ 23; *see also* Doc. Nos. 28-9; 28-10.) Before June 2023, the last known incident of a stolen firearm was in August 2022. (Doc. No. 28-10 at 6–8.) Multiple customers whose firearms were stolen expressed skepticism to the police that their vehicles were locked while parked at TPS Nashville. (Doc. Nos. 28-9 at 11, 15, 23; 28-10 at 8.)

### D. The Events of June 1, 2023

On June 1, 2023, TPS Nashville personnel noticed Delama Casimir exiting Lot 9. (*Id.* ¶ 36.) A valet employee approached Casimir and asked what he was doing. (*Id.* ¶ 37.) Casimir told the employee that he needed a vehicle and showed the employee a service receipt for a vehicle belonging to Stanley Slaton, a "regular customer" of TPS Nashville. (Doc. No. 28-1 at 33:7.) The employee told Casimir to go to the front office building. (Doc. No. 39 ¶ 38.)

Once at the front office building, Casimir approached the front desk and asked for the keys to Slaton's vehicle. (*Id.* ¶ 38.) The general manager, Hockert, was informed of Casimir's presence. (*Id.* ¶ 43.) After learning that Casimir had been spotted near Lot 9, Hockert decided to walk to that lot and check on Slaton's vehicle. (*Id.* ¶¶ 44–45.) Hockert came across a mess. The inside of Slaton's vehicle was "disheveled" with items in the interior "thrown everywhere." (Doc. No. 28-1 at 22:10–11.) A cup had spilled into the passenger seat, which was "fresh" and led Hockert to

conclude that Casimir "had probably gotten into [Slaton's] vehicle." (*Id*. at 22:11–19.) Hockert had seen enough to know that something was not right. (*Id*. at 22:19–20.)

Returning to the front office building, Hockert told Casimir that he did not believe his story and that he was calling the police. (*Id*. at 22:21–25—23:1–3.) Casimir then left the front office building, jumped into a customer's vehicle, and attempted to hijack the vehicle. (*Id*. at 23:8–12.) Casimir was removed from the vehicle and fled the property. (*Id*. at 23:12–19.) The police arrived on the scene but soon concluded that Casimir had fled the area. (*Id*. at 27:25—28:1–5.) Believing that Casimir was gone, TPS Nashville continued with its operations. (*Id*. at 28:22–25—29:1–5.)

About two hours later, a TPS Nashville employee heard car alarms and observed Casimir attempting to break into a customer's vehicle with a metal tool in one of the rear lots. (*Id*. at 29:6–15; Doc. No. 28-5 at 5:6–16.) This time, Detective Donovan Coble arrived at the scene where he observed Casimir inside a customer's vehicle. (Doc. Nos. 28-1 at 33:7–14; 39 ¶ 79.) After confronting the suspect, Casimir attempted to flee and a foot chase ensued. (Doc. No. 28-8 at 5:16–18.) Detective Coble and Casimir exchanged gun fire and Detective Coble was struck in the chest with a bullet. (*Id*. at 5:24–25—25:1–7.) He was subsequently transported to the hospital where he underwent emergency surgery for shattered ribs and multiple damaged internal organs. (Doc. No. 40-5 at 25:23–25—26:1–5.) Casimir was shot and killed later that afternoon when police tried to apprehend him. (Doc. Nos. 27 at 11; 39 ¶ 88.)

The handgun used to shoot Detective Coble was later recovered and belonged to the wife of Stanley Slaton, the TPS Nashville customer. (Doc. Nos. 39 ¶ 89; 28-15 at 6.) The gun was left in the center console of Slaton's vehicle while it was parked at TPS Nashville. (Doc. No. 28-15 at 6.) Casimir had apparently stolen the handgun when he broke into Slaton's vehicle at the beginning of his crime spree.

### E. This Case

Detective Coble has brought this negligence action against TPS, the parent company of TPS Nashville. The thrust of his negligence claim is that TPS Nashville had a documented history of gun thefts from customer vehicles parked on the company's lots. (Doc. Nos. 1-1 ¶¶ 8, 26–27; 37 at 1–5, 10–14.) For factual support, Coble relies on the eight separate incidents between 2019 and 2022 of firearms being stolen from customer vehicles, which is reflected in contemporaneous police incident reports in the record. (Doc. Nos. 28-9; 28-10.) Coble describes these incidents as fitting "a pattern" of gun theft at TPS Nashville. (Doc. No. 37 at 1, 3–5.) The risks associated with this pattern were allegedly compounded by TPS Nashville's "systemic failure" to maintain adequate security practices and infrastructure on its property. (*Id*. at 13.)

The alleged deficiencies in security practices include employees leaving customer vehicles unlocked on a routine basis, as evidenced by the absence of vehicle damage or forced entry in earlier incidents of documented gun theft at TPS Nashville. (*See, e.g.*, Doc. Nos. 28-9 at 11 (customer reporting in August 2019 that "the vehicle was unlocked" and that "no damage to the outside or inside of the vehicle" existed after discovering theft of firearm from vehicle); *id*. at 15 (customer reporting in September 2019 that "there was no damage or sign of forced entry into the vehicle" after discovering theft of firearm from vehicle); *id*. at 23 (customer reporting in August 2021 that "there was no damage to the vehicle" and that he was unsure if vehicle was locked after discovering theft of firearm from vehicle); 28-10 at 8 (customer reporting in August 2022 that "no damage was done to the vehicle" and that he "believes the vehicle was unlocked.")).) Coble also charges that TPS Nashville failed to implement adequate policies for securing visible firearms inside customer vehicles parked at TPS Nashville. (Doc. No. 37 at 3, 13; *see also* Doc. No. 28-1

at 34:9–21 (Hockert testifying that "no specific policy" exists at TPS Nashville for handling visible weapons in a customer's vehicle and that he follows his own "personal policy" on the matter)).)

Beyond the company's deficient policies and practices, Coble alleges that TPS Nashville also failed to maintain adequate security infrastructure. Parts of the security fencing that surrounds the rear parking lots are either broken or missing altogether, thereby providing open access to trespassers. (Doc. No. 37 at 2–3, 13–14, 15.) Unlike the front office building, the rear parking lots are not monitored with either surveillance cameras or regular security patrols. (*Id*. at 3, 17.)

## II. PROCEDURAL HISTORY

In May 2024, the plaintiffs filed suit against TPS in the Circuit Court of Davidson County, Tennessee, seeking $8,000,000 in damages from TPS. (*Id*. at 10.) Count 1 in the Complaint is a negligence claim asserted by Detective Coble against TPS. (*Id*. ¶¶ 26–36.) Count 2 is a derivative claim asserted by Coble's wife, Kayla Coble, for loss of consortium. (*Id*. ¶¶ 25, 43.) TPS removed the action to this court on diversity grounds under 28 U.S.C. §§ 1332 and 1441. (Doc. No. 1 ¶¶ 2–10.) In June 2024, TPS filed an answer denying the material allegations in the Complaint. (Doc. No. 7.)

In January 2026, TPS filed a Motion for Summary Judgment under Federal Rule of Civil Procedure 56, seeking the dismissal of the plaintiffs' negligence and loss of consortium claims. (Doc. No. 26.) TPS' motion was accompanied by a Memorandum of Law (Doc. No. 27), a Statement of Undisputed Material Facts (Doc. No. 28), and various exhibits relied on in support of the motion. (Doc. Nos. 28-1 through 28-16.) The plaintiffs have filed a Response and Memorandum of Law in Opposition to TPS' Motion for Summary Judgment (Doc. No. 37), a Statement of Undisputed Material Facts *in Opposition to* TPS' Motion for Summary Judgment (Doc. No. 38), a *Response* to TPS' Statement of Undisputed Material Facts (Doc. No. 39), and various exhibits (Doc. Nos. 40-1 through 40-11.) Written briefing on the pending motion

concluded when TPS filed a Reply Memorandum in Support of its Motion for Summary Judgment. (Doc. No. 43.)

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can meet this burden by identifying and citing specific portions of the record—including "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—which establish the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). If the moving party meets its burden, the burden shifts to the non-moving party to provide evidence beyond the pleadings showing a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). In evaluating the evidence, the court assumes that the evidence of the non-moving party is true and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255.

At the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Nevertheless, the "mere existence of a scintilla of evidence in support of the" non-moving party is not sufficient to avoid summary judgment. *Id*. at 252. "There must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" non-moving party is entitled to a verdict. *Id.*

## IV. DISCUSSION

In Tennessee, a plaintiff must establish four essential elements to prevail on a negligence claim: (1) a duty of reasonable care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care and thus amounting to a breach of that duty; (3) actual and proximate causation; and (4) an injury or loss suffered by the plaintiff. *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008).

In its motion, TPS asserts that summary judgment in its favor is warranted because Coble cannot establish that TPS had a duty to protect him. (Doc. No. 27 at 14–16.) For this argument, TPS highlights that Coble was not a *customer* when he entered the TPS Nashville property. (*Id*. at 15.) Instead, Coble "entered the TPS Nashville premises solely as [a Metropolitan Nashville Police Department] police officer responding" to TPS Nashville's request for emergency help, "and his pursuit of and ensuing shootout with Casimir were all official police activities." (*Id*. at 16.) According to TPS, a business does not owe a duty of care to protect an on-duty police officer from the criminal acts of a third party that occur on the business' premises. (*Id*. at 14–26.)

TPS marshals legal authority stating that businesses "do not ordinarily have a duty to protect others from dangers or risks except for those that they themselves have created." (*Id*. (quoting *Satterfield*, 266 S.W.3d at 357).) An exception to this general rule exists when the

business "stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger." *Biscan v. Brown*, 160 S.W.3d 462, 478–79 (Tenn. 2005) (quoting *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997) (internal quotation marks omitted). Tennessee courts have long recognized the "special relationship" existing between a business and a customer. *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 902 (Tenn. 1996).

In TPS' view, the Tennessee Supreme Court's decision in *McClung* precludes this court from finding that any legal duty was owed by TPS to protect Detective Coble against the criminal acts of a third party on TPS' property. (*Id*. at 15–16 (citing 937 S.W.2d at 899).) In *McClung*, a plaintiff asserted a negligence claim against the owners, operators, and tenants of a shopping mall after the plaintiff's wife was abducted from the shopping mall's parking lot and later raped and murdered. *McClung*, 937 S.W.2d at 893. The plaintiff alleged that the defendants were negligent in failing to provide adequate security in the parking lot and that the defendants' negligence was the proximate cause of the death of the plaintiff's wife. *Id*. at 894. The trial court granted summary judgment in the defendants' favor based on the Tennessee Supreme Court's holding in *Cornpropst v. Sloan,* 528 S.W.2d 188 (Tenn. 1975), which limited the duty owed by shop owners to protect customers against the criminal acts of third parties. After the trial court's ruling was affirmed on appeal, the Tennessee Supreme Court overturned *Cornpropst* and fashioned a new rule that a business has a duty to take reasonable precautions to protect *customers* from the foreseeable criminal acts of unknown third parties on the business' premises. *Id*. at 898.

The plaintiffs here disagree with TPS's no-duty argument, responding that the "duty articulated in *McClung* is not limited to 'customers' in the narrow commercial sense." (Doc. No. 37 at 9 (quoting *McClung*, 937 S.W.2d at 895).) Rather, the duty owed by a business to protect

against the criminal acts of third parties extends to all "'members of the public' who are on the premises 'for' the owner's 'business purposes,'" including police officers. (*Id*. (quoting *McClung*, 937 S.W.2d at 895).) As support, the plaintiffs point out that *McClung* adopted the standard from the Restatement (Second) of Torts, which provides:

> A possessor of land who holds it open to the public for entry for his *business purposes* is subject to liability to *members of the public* while they are upon the land *for such a purpose*, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons . . . .

Restatement (Second) of Torts § 344 (1965) (emphasis added). Applying this standard, the plaintiffs assert that TPS owed a duty to Detective Coble because his law enforcement activities at TPS Nashville on June 1, 2023 constituted a "business purpose" within the meaning of *McClung* and the Restatement. (Doc. No. 37 at 9.) The plaintiffs argue that Detective Coble was responding to "TPS's specific request for police assistance with criminal activity that TPS knew was occurring on its property," which was a "business purpose" because the company "could not continue its business operations while an armed intruder was running amok on its property." (*Id*.) Hence, TPS owed a duty of care to protect Detective Coble from the injuries that he suffered during the shoot-out with Casimir. (*Id*. at 8–10.) For the following reasons, the court finds that TPS did not owe a duty of care to Detective Coble. The parties neither enjoyed a "special relationship" nor did Coble's presence at TPS Nashville amount to a "business purpose." As the court finds that no duty exists, the court declines to consider the other arguments raised by TPS in its motion.

A federal court exercising diversity jurisdiction must "follow the decisions of the state's highest court when that court has addressed the relevant issue." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008); *Monday-W. v. Wells Fargo Bank, N.A.*, No. 20-6381, 2022 WL 16848879, at *4 (6th Cir. Nov. 9, 2022). If the issue has not been addressed by the state's highest court, the federal court must predict how the forum state's highest court would rule on the issue

by looking to "all relevant data," including intermediate state appellate court decisions and other persuasive authority. *Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995); *SHH Holdings, LLC v. Allied World Specialty Ins. Co.*, 65 F.4th 830, 836 (6th Cir. 2023). Courts refer to this framework for interpreting unsettled questions of state law as an "*Erie* guess." *Klopfenstein v. Fifth Third Bank*, 177 F.4th 753, 761 (6th Cir. 2026). This responsibility, however, is not a license for the federal court sitting in diversity to expand unsettled questions of state law beyond the bounds set by the forum state's highest court. *Goranson v. Kloeb*, 308 F.2d 655, 656–57 (6th Cir. 1962); *Colley v. Neighbors Credit Union*, No. 4:25-CV-00687-SRC, 2026 WL 864583, at *13 (E.D. Mo. Mar. 30, 2026) (federal court exercising diversity jurisdiction must "exercise caution" before "extending a legal duty to a novel set of facts.").

As an initial matter, the court notes that neither party has presented any Tennessee case establishing that a business owes a duty to protect on-duty police officers from the criminal acts of unknown third parties based on the existence of a special relationship. After its own extensive research, the court is not aware of any decision (in Tennessee or elsewhere) recognizing such a duty. The court must therefore consider how the Tennessee Supreme Court, if presented with this case, would resolve it.

The Tennessee Supreme Court has recognized the duty owed by a business to protect various classes of individuals from third-party criminal acts based on the existence of a special relationship. Such a special relationship has been recognized in the medical field. *See Turner*, 957 S.W.2d at 820 (Tenn. 1997) (hospital psychiatrist owed a duty of care to protect a hospital nurse from the violent acts of psychiatrist's mentally ill patient based on the psychiatrist-patient relationship); *Burroughs v. Magee,* 118 S.W.3d 323, 332 (Tenn. 2003) (physician owed duty to third party victims of automobile accident to warn physician's patient of the risks of driving while

under the influence of prescribed medications). Special relationships have also been recognized between landlords and tenants. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 371 (Tenn. 2009) (landlord owed duty to tenant to take reasonable precautions to protect tenant from criminal acts of third parties on leased premises). Special relationships have been recognized in other contexts too. *Satterfield*, 266 S.W.3d at 352 (company that manufactured products containing asbestos owed duty to employee's deceased daughter to prevent daughter "from being exposed repeatedly and regularly over an extended period of time to the asbestos fibers on" employee's work clothes); *Biscan v. Brown*, 160 S.W.3d 462, 484 (Tenn. 2005) (adults who facilitate underage drinking on their property owe duty to minors and third parties injured by those minors).

As one Tennessee court has recognized, the existence of a special relationship often turns on the degree to which "dependence, knowledge, and control" define the relationship. *Marr v. Montgomery Elevator Co.*, 922 S.W.2d 526, 529 (Tenn. Ct. App. 1995). The highest courts of other states have reached similar conclusions. *See, e.g.*, *Murdock v. Higgins*, 559 N.W.2d 639, 643 (Mich. 1997) (a "special relationship" under Michigan law hinges on whether someone "entrusted himself to the protection and control" of another person "and, in so doing, lost the ability to protect himself."); *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168 (Minn. 1989) ("If the law is to impose a duty on A to protect B from C's criminal acts, the law usually looks for a special relationship between A and B, a situation where B has in some way *entrusted* his or her *safety* to A and A has *accepted that entrustment*," which "also assumes that the *harm* represented by C is something that A is in a *position to protect against* and should be *expected to protect against*.") (emphasis added).

Against this backdrop, the court is not persuaded that a special relationship existed between TPS and Detective Coble that would give rise to a legal duty. As a threshold matter, the qualities that give rise to a special relationship—dependence, control, and trust—are not present here. TPS

Nashville did not exert "control" over Detective Coble, a police officer charged with protecting the community from crime. In fact, the opposite is true: the undisputed facts show that TPS Nashville—confronting an armed suspect on its property—summoned the police for emergency help. (Doc. No. 39 ¶¶ 47, 51, 69.) The responding officers, including Detective Coble, attempted to exert control over the environment by restoring public safety. (*Id.* ¶ 76.) Nor was Detective Coble "dependent" on TPS Nashville. To the contrary, the personnel and customers at TPS Nashville were *dependent on the police* to restore public safety. (*Id.* ¶¶ 47, 51, 69.) The plaintiffs' own observation proves the point: Detective Coble was responding to "TPS's specific request for police assistance with criminal activity" because the company "understood that it could not continue its business operations while an armed intruder was running amok on its property." (Doc. No. 37 at 9.) That observation reflects TPS Nashville's dependence on the police and is dispositive.

Here, the record does not establish that TPS Nashville exerted control over Detective Coble or that Detective Coble was dependent on TPS Nashville—the hallmarks of a special relationship that give rise to a legal duty of care. *Marr*, 922 S.W.2d at 529. Unlike those relationships that the Tennessee Supreme Court has found merit the imposition of a duty where one would otherwise not exist—relationships between a business/customer, doctor/patient, landlord/tenant, and adult/minor—the relationship between a police officer and a private citizen summoning the police officer for help is fundamentally different. Quite simply, the police exist to protect the citizen from the threats posed by unknown third parties. The citizen places her trust in and depends on the police to perform this essential public service, which is reflected in the awesome power wielded by the police: the power of the state to enforce the law, including by the use of force, if necessary. To hold that the citizen (including a commercial establishment) owes a duty to protect the police from unknown third-party criminals reverses the duty.

The court is also not persuaded that Detective Coble's presence at TPS Nashville amounted to a "business purpose" as that term is understood in *McClung* and the Restatement (Second) of Torts. (Doc. No. 37 at 9.) Second 344 addresses the liability of a business owner who holds his land "open to the public for entry for his *business purposes*" when "members of the public" are injured "upon the land *for such a purpose*." Restatement (Second) of Torts § 344 (1965) (emphasis added). As noted earlier, this standard was adopted by the Tennessee Supreme Court in *McClung*, which addressed the duty owed by a *business* to protect the *customer* from the foreseeable criminal acts of unknown third parties. *McClung*, 937 S.W.2d at 898–99. To the extent the plaintiffs rely on this standard as an independent basis for establishing premises liability, the plaintiffs cite no court decision finding that an on-duty police officer's presence at a business' property in response to an active criminal emergency constitutes a "business purpose."

The absence of any controlling or persuasive authority adopting the plaintiffs' interpretation of this term is telling, and likely for good reason: if a police officer's presence on a business' property in the course of his official duties amounted to a "business purpose," the business may be deterred from requesting emergency help going forward. The consequences borne by this deterrence could be felt by the business' customers and employees—the individuals in closest physical proximity to the business. The obvious retort to this perceived consequence is that businesses should absorb the costs of their own failure to secure their premises and that employees and customers could also sue the business based on the injuries that they sustained while on the business' property. That may be true, but those arguments do not transform the police officer's presence into that of a "business purpose."

Other unintended consequences could result. As an example, a sweeping new ruling which found that a "business purpose" encompasses an on-duty police officer's presence at a business

establishment could precipitate a cascade of premises liability suits brought against businesses by police officers. These are some of the most obvious consequences that could flow from adopting the plaintiffs' interpretation of this term, but they are enough to dissuade this court from expanding state law premises liability to an unprecedented class of persons.

In sum, the court concludes that the Tennessee Supreme Court would not find that TPS owed a duty of care to Detective Coble under the facts of this case. Detective Coble was acting in his official capacity when he responded to a request for emergency help by a private business that was itself the *victim* of ongoing criminal activity at its place of business. No doubt, the facts presented in this case are novel and unique. The outcome may have been different, had Detective Coble been an actual or prospective customer or an employee of TPS Nashville. But those are not the facts of this case. In the absence of controlling or persuasive authority recognizing such a duty, this court is not prepared to "blaze new and unprecedented jurisprudential trails to expand existing state doctrine." *Dushkin v. Desai*, 18 F. Supp. 2d 117, 122 (D. Mass. 1998) (internal quotation marks omitted). The court concludes that Detective Coble's negligence claim against TPS fails as a matter of law. *Biscan*, 160 S.W.3d at 478 ("The existence of the first element, duty, is a question of law.") (citation omitted).

Given this ruling, the court further finds that Ms. Coble's derivative claim for loss of consortium against TPS must also be dismissed. *See Yebuah v. Ctr. for Urological Treatment, PLC*, 624 S.W.3d 481, 488 (Tenn. 2021) ("A loss of consortium claim is a derivative claim, and recovery is dependent on the spouse's recovery.").

## V. CONCLUSION

For the reasons stated herein, the Motion for Summary Judgment (Doc. No. 26) filed by TPS will be granted and the plaintiffs' Complaint (Doc. No. 1-1) will be dismissed in its entirety. The Motion *In Limine* to Exclude Plaintiffs' Expert (Doc. No. 46) will be denied as moot.



Case 3:24-cv-00721 Document 53 Filed 08/31/26 Page 16 of 17 PageID #: 1412

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge